UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

CIVIL ACTION NO. 06-01515-RGS

ALFREDO CASTELLANOS-BAYOUTH
and
ASOCIACIÓN DE ABOGADOS ESTADISTAS,
Intervenor Plaintiff

v.

PUERTO RICO BAR ASSOCIATION
and
JULIO FONTANET

MEMORANDUM AND ORDER ON DEFENDANTS'
MOTIONS TO DISMISS

April 6, 2007

STEARNS, D.J.

When attorney Alfredo Castellanos-Bayouth (Castellanos) refused as a matter of principle to pay his annual bar dues to the Puerto Rico Bar Association (the Colegio), he found himself facing disbarment. On May 22, 2006, Castellanos filed this lawsuit against the Colegio and its President, Julio Fontanet.[1] In his Second Amended Complaint (Complaint), Castellanos seeks a declaratory judgment that Puerto Rico's compulsory bar membership Law Number 43, May 14th, 1932 (4 L.P.R.A. 771) (Law 43), is unconstitutional as applied in his case. He also asserts that Law 43 has been preempted by the "USA PATRIOT" Act of 2001 (Patriot Act).[2] Castellanos makes essentially the same

---

[1] The current president of the Colegio is Celina Romany.

[2] "USA PATRIOT" is an acronym for "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism." Pub.L. No. 107-56, 115 Stat. 272 (Oct. 26, 2001).

claims under the federal civil rights statute, 42 U.S.C. § 1983.[3]  On August 24, 2006, the Asociación de Abogados Estadistas (AAE), a non-profit organization of 532 attorneys "identified with the Statehood" cause, filed an Intervenor Complaint that is largely identical to the Castellanos Complaint.  Defendants have moved to dismiss both the Castellanos Complaint and the Complaint brought by the AAE.  On February 23, 2007, the court heard oral argument on the motions to dismiss.

<u>BACKGROUND</u>

Puerto Rico has an integrated bar.  To practice law in the courts of Puerto Rico, a lawyer must be a member of the Colegio.  Members of the bar are required to pay $200 in annual dues to the Colegio by January 31 of each year.  If an attorney does not comply, the Colegio is obligated by Law 43 to petition the Supreme Court of Puerto Rico for his or her separation from the practice of law.  <u>See</u>  4 L.P.R.A. 781.

Castellanos claims that compulsory membership in the Colegio violates the United States Constitution by requiring attorneys to associate with an organization that aids and abets terrorism.  Castellanos points to the Colegio's "links" to Filiberto Ojeda-Ríos, the former commander of the military wing of Fuerzas Armadas de Liberación Nacional (the FALN).  The FALN, which is more familiarly known as the "Macheteros," waged a lengthy terrorist campaign demanding the unconditional independence of Puerto Rico.  The

---

[3]Castellanos seeks an order enjoining the disbarment proceedings in his case.  He also requests that the court appoint a special master to oversee the Revisory Board and the Colegio to insure that their actions do not violate the constitutional rights of other members of the Puerto Rico bar.  Complaint, ¶¶ 51- 56.  In Count II, the § 1983 claim, Castellanos seeks $1.00 in nominal damages from each defendant as well as attorneys' fees and costs.  <u>Id.</u> at ¶¶ 57-58.

Macheteros bombed a number of U.S. installations, including military fighter jets stationed at the Air National Guard base in Muñiz.  The Macheteros also "expropriated" $7 million in 1983 from a Wells Fargo depot in Hartford, Connecticut.  After a seventeen-year manhunt, Ojeda-Ríos was gunned down in a shoot-out with FBI agents in Hormigueros, a small town west of San Juan, on September 24, 2005.

Hours after the shooting, defendant Fontanet paid a sympathy call on Ojeda-Ríos' widow at the federal prison at Guaynabo.  He later eulogized Ojeda-Ríos at a formal press conference, and with the approval of the Colegio's Board, made a function room available for a lying in state of Ojeda-Ríos' body.[4]  Speeches delivered at the memorial service referred to Ojeda-Ríos' "heroism, courage, and just fight against the American oppressor."  Complaint, ¶ 19. According to Castellanos, the funeral procession "was characterized by chants and slogans against the United States, vowing to violently overthrow the government."  Id. at ¶ 20.  Castellanos argues that by hosting the memorial service, the Colegio gave "aid and comfort" to a left-wing terrorist organization and its sympathizers.[5]  Id.

Outraged by the actions of the Colegio and President Fontanet, Castellanos refused to pay his 2006-2007 bar dues.  On March 23, 2006, he filed a motion with the Supreme

---

[4]See Félix Jiménez, *The Killing of Filiberto Ojeda-Ríos*, available at http://www.thenation.com/doc/20051024/jimenez.

[5]Within days of the memorial service, local media reported that police had received several bomb threats aimed at public and government buildings.  A group of thirty students, banded together as the "Filiberto Ojeda-Ríos Contingent," occupied the ROTC building at the University of Puerto Rico's Mayagüez campus, demanding that the ROTC and the FBI evacuate immediately from Puerto Rico.  A flag bearing an image of Ojeda-Ríos' face was draped from a window of the ROTC building.  Complaint, ¶ 21.

Court of Puerto Rico seeking permission to deposit his dues into the Court's registry.  See Exhibit 2.  The motion was denied on May 1, 2006.  Castellanos alleges that "disbarment procedures" were instituted immediately thereafter.  Complaint, ¶ 24.

Castellanos argues that Law 43 is unconstitutional because it conflicts with Article III, Section 3 of the United States Constitution (defining treason),[6] as well as with provisions of the Patriot Act.  This is not the first time that the constitutionality of Law 43 has been litigated.  In 1982, two members of the Puerto Rico bar filed suit against the Colegio, arguing as does Castellanos, that Law 43 violated their constitutional rights by requiring them to financially support an organization whose ideological and political causes conflicted with their personal beliefs.  See Schneider v. Colegio de Abogados de Puerto Rico, 546 F. Supp. 1251 (D.P.R. 1982) (Schneider I).[7]  The district court agreed. Schneider v. Colegio de Abogados de Puerto Rico, 565 F. Supp 963, 978 (D.P.R. 1983) (Schneider II).  The Supreme Court of Puerto Rico then undertook a revision of the Colegio's membership rules in an attempt to bring them into compliance with constitutional requirements.  After some fourteen years of litigation in the federal courts, the rules changes proposed by the Supreme Court of Puerto Rico were finally approved.  See

---

[6]"Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort.  No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court.  The Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted."

[7]I have labeled the Schneider cases cited in this opinion as Schneider I through Schneider IV for convenience of reference.  In fact, at least 11 Schneider-related cases appear in the official reports.

Schneider v. Colegio de Abogados de Puerto Rico, 947 F. Supp. 34, 42 (D.P.R. 1996) (Schneider III).[8]

Castellanos insists that the approval given by Schneider III to the revised rules was superseded by the "new legal reality" that followed the terrorist attacks of September 11, 2001.  Castellanos argues that the Patriot Act – "a revolutionary piece of legislation" – created an expansive new definition of "domestic terrorism."[9]   Complaint, ¶ 16. Castellanos maintains that compulsory association with the Colegio now puts him doubly at risk because of the heightened surveillance of U.S. citizens authorized by the Patriot Act.[10] Castellanos has attached to his Complaint news clippings dramatizing the allegation

---

[8]The Rules now divide the Colegio's activities into two groups: "Category I" activities deal solely with the regulation of the legal profession; "Category II" activities carry "ideological overtones."  Puerto Rico Supreme Court Regulations, Rule 2(A)(2).  The Rules permit members to withhold their support of Category II activities.  See Rule 5(B).  The procedure for opting out of Category II activities is set out in Rule 9(B).

[9]The Patriot Act defines "domestic terrorism" to include activities that – "(A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; (B) appear to be intended – (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States." 18 U.S.C. § 2331(5).

[10]Opponents of the Patriot Act argue that "[b]ecause the crime of 'domestic terrorism' is couched in such vague and expansive terms, it may well be read by federal law enforcement agencies as licensing the investigation and surveillance of political activists and organizations based on their opposition to government policies. It also may be read by prosecutors as licensing the criminalization of legitimate political dissent. Vigorous protest activities, by their very nature, could be construed as acts that 'appear to be intended…to influence the policy of a government by intimidation or coercion.' Further, clashes between demonstrators and police officers and acts of civil disobedience – even those that do not result in injuries and are entirely non-violent – could be construed as 'dangerous to human life' and in 'violation of the criminal laws.' . . . Political activists and the organizations with which they associate may unwittingly find themselves the subject of unwanted government attention in the form of surveillance and other

that the FBI "may now go from phone to phone, computer to computer" to investigate the private lives of citizens.  Among the articles are several taken from the *New York Times* describing:  (1) an instance in which the FBI acquired records from scuba diving shops under the guise of investigating waterborne terrorist attacks; (2) a televised appearance of Attorney General John Ashcroft in which he identified Dr. Steven Hatfill as a "person of interest" in the investigation of the 2001 anthrax attacks; and (3) the National Security Agency's amassing of a secret database of private telephone records acquired from AT&T, Verizon, and BellSouth.  Castellanos also cites the February 6, 2002 congressional testimony of Dale Watson, the Assistant Director of the FBI's Counterterrorism Division, in which he stated that "[t]errorist groups seeking to secure full Puerto Rican independence from the United States through violent means represent one of the remaining active vestiges of the left-wing terrorism. . . . Acts of terrorism continue to be perpetrated . . . by violent separatists in Puerto Rico."  Complaint, ¶ 17.

Castellanos states that he "could possibly" suffer irreparable damage if he is forced to remain a member of the Colegio.  Castellanos recognizes that he is obligated to pay annual dues if he is to continue practicing law in Puerto Rico.  However, he maintains that he cannot be faithful to his oath to defend the Constitution of the United States and at the same time financially support an organization that he believes advocates treasonous causes.  He states with great conviction that his conscience does not permit the

---

intelligence-gathering operations." Nancy Chang, *Silencing Political Dissent: How Post-September 11 Anti-Terrorism Measures Threaten Our Civil Liberties* (New York: Seven Stories Press, 2002), 43.

segregation of his loyalties.  He urges the court to find that Law 43, as applied in his case, violates his rights under the First Amendment.

DISCUSSION

The Colegio argues that this court lacks jurisdiction to hear the case under the abstention doctrine of <u>Younger v. Harris</u>, 401 U.S. 37 (1971).  To be precise, <u>Younger</u> abstention does not stem from lack of subject matter jurisdiction, but "from strong policies counseling against the exercise of such jurisdiction [by a federal court] where particular kinds of state proceedings have already been commenced." <u>Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.</u>, 477 U.S. 619, 626 (1986).  Abstention is "the exception, not the rule." <u>New Orleans Pub. Serv. Inc. v. City of New Orleans</u>, 491 U.S. 350, 359 (1989). In one circumstance, however, <u>Younger</u> abstention is *required*: when a federal plaintiff seeks to enjoin an ongoing criminal proceeding in a state court, a federal court *must* abstain, absent extraordinary circumstances.  <u>Younger</u>, 401 U.S. at 53-54.  "[T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." <u>Id.</u> at 45.

The Court's holding in <u>Younger</u> was influenced in part by principles of equity. "[C]ourts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." <u>Younger</u>, 401 U.S. at 43-44.  An even more compelling consideration, as the Court explained, is comity.  "[A] proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare

best if the States and their institutions are left free to perform their separate functions in their separate ways . . . [comity reflects a system] in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." Id. at 44.

The Supreme Court has since extended the Younger doctrine to civil proceedings that implicate important state interests.[11]  Huffman v. Pursue, Ltd., 420 U.S. 592, 604 (1975) (Younger abstention applicable in civil nuisance proceedings); Moore v. Sims, 442 U.S. 415, 435 (1979) (same, child custody proceedings).  Of greatest relevance to this case is Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423 (1982). In Middlesex, the New Jersey Bar Ethics Committee instituted disciplinary proceedings against a criminal defense attorney who made statements critical of a state trial judge.  Id. at 428.  The attorney brought suit in federal court, seeking to enjoin the state proceedings on grounds that the Committee's rules of professional conduct violated his First Amendment rights.  The Supreme Court applied a three-pronged test and ruled that Younger abstention was appropriate. Id. at 434-435.

To prevail under the test set out in Middlesex, defendants must demonstrate: (1) that the disbarment proceeding is ongoing and of a judicial nature; (2) that the proceeding implicates important state interests; and (3) that there is an adequate opportunity in the state proceedings for Castellanos to raise his federal constitutional claims.  Id. at 432.  In

---

[11]The Younger doctrine applies only when the relief asked of the federal court "interfere[s] with the state proceedings." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 70 (1st Cir. 2005).

Middlesex, the Supreme Court observed that "it was clear beyond doubt" that the New Jersey Supreme Court considered its bar disciplinary proceedings as "judicial" in nature. Therefore, the first prong of the Middlesex test was satisfied. Id. at 433-434.  The Court further found that the second prong of the test was met because a State has an "extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses." Id. at 434.  Finally, the Court found that the third prong of the test was satisfied because the plaintiff was given an opportunity to raise his constitutional claims in the New Jersey Supreme Court. Id. at 435-436.

The Colegio persuasively argues that each of the three prongs of the Middlesex test have been met in Castellanos' case.  As for the first prong, the Complaint acknowledges that disbarment proceedings have been initiated and are pending in the Supreme Court of Puerto Rico.  However, Castellanos argues that Middlesex does not apply because *he* has not initiated any type of legal action in the courts of the Commonwealth.  This is a distinction of rather obscure consequence and of no legal import: disciplinary proceedings have been initiated against Castellanos and that is all that Middlesex requires.  As the Court stated in Middlesex, "[f]rom the very beginning a disciplinary proceeding is judicial in nature, initiated by filing a complaint with an ethics and grievance committee." Id. at 433. Disbarment proceedings are conducted before the full bench of the Supreme Court of Puerto Rico and are indisputably of a judicial nature.  Castellanos does not contend otherwise.

As for the second prong of the test, the Commonwealth has an important state interest in regulating the practice of law in its own courts.  As the Supreme Court observed

in Middlesex, "states traditionally have exercised extensive control over the professional conduct of attorneys." Id. The First Circuit has expressly held that the Commonwealth of Puerto Rico has the lawful prerogative of conditioning the right to practice law in its courts on membership in the Colegio. See Schneider v. Colegio de Abogados de Puerto Rico, 917 F.2d 620, 624 n.3 (1st Cir. 1990), *cert. denied,* 502 U.S. 1029 (1992) (Schneider IV).

Finally, in satisfaction of the third prong of the test, Castellanos is guaranteed the opportunity to have his federal constitutional claims heard by the Supreme Court of Puerto Rico. As explained by the Colegio, Castellanos must first raise his claims in the proceedings before the Revisory Board.  The final decision of the Revisory Board is directly appealable to the Supreme Court of Puerto Rico.  It is true that the extent to which the Revisory Board will entertain Castellanos' constitutional objections "is unclear, but the [Supreme Court] clearly would do so and this is enough."  Maymó-Meléndez v. Álvarez-Ramírez, 364 F.3d 27, 36 (1st Cir. 2004).  Moreover, Castellanos is entitled to seek a writ of certiorari from the United States Supreme Court should he believe that the Supreme Court of Puerto Rico has committed constitutional error in its ultimate resolution of his federal claims. See Younger, 401 U.S. at 49.

As a rule, Younger abstention is mandated if the three-part test of Middlesex is met.  However, there are exceptions.  A federal court should consider intervention if there are indications that state proceedings were brought in "bad faith" or to "harass," or where a challenged state statute is "flagrantly and patently" unconstitutional.  Younger, 401 U.S. at 53-54; Brooks v. New Hampshire Supreme Court, 80 F.3d 633, 639 (1st Cir. 1996).  Overt bias is another "extraordinary circumstance" that may warrant federal

intervention.  Esso Standard Oil Co. (Puerto Rico) v. Cotto, 389 F.3d 212, 219 n.6 (1st

Cir. 2004), citing Kugler v. Helfant, 421 U.S. 117, 125 n.4 (1975).  In any event, there

must be a strong showing that great and irreparable harm will result if injunctive relief is

not granted.  Maymó-Meléndez, 364 F.3d at 37.

    None of the Younger exceptions are at issue in this case.  Castellanos does not

make any claim of bias or harassment.  Nor is the exception involving a "flagrantly" or

"patently" unconstitutional statute at play.   It is well-settled that compulsory bar

membership does not violate the First Amendment.  Keller v. State Bar, 496 U.S. 1, 14

(1990).[12]  In Lathrop v. Donohue, 367 U.S. 820 (1961) (plurality opinion), a Wisconsin

attorney brought an action seeking a refund of his bar dues, arguing that the state bar

association engaged in illicit activities of "a political and propaganda nature."  Id. at 822.

While a plurality of the Justices held that the compulsory payment of dues to an

integrated bar was constitutional, see id. at 843, the Court reserved the issue of the

constitutionality of requiring unwilling members to financially support certain types of

political and legislative activities.  Id. at 848.

_____

[12]In so concluding, the Supreme Court relied on prior decisions involving compulsory
union membership.  For example, in Railway Employees' Dept. v. Hanson, 351 U.S. 225
(1956), the Supreme Court considered a provision in a collective bargaining agreement
that required all railroad employees to become union members as a condition of
employment.  Id. at 227.  The employees argued, inter alia, that the provision violated
their First Amendment rights because it forced them into unwanted ideological and
political associations.  Id. at 236.  In response, Justice Douglas wrote that "[t]here is no
more an infringement or impairment of First Amendment rights [in compulsory union
membership] than there would be in the case of a lawyer who by state law is required to
be a member of an integrated bar."  Id. at 238.

The issue was met head on in <u>Keller</u>.  In <u>Keller</u>, the Court drew on <u>Abood v. Detroit Bd. of Education</u>, 431 U.S. 209 (1977).  <u>Abood</u> held that there is no general constitutional prohibition against a union spending its "funds for the expression of political views . . . or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative."  <u>Id.</u> at 235. " [T]he Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment."  <u>Id.</u>, at 235-236.[13]   T h e <u>Keller</u> Court extended the reasoning of <u>Abood</u> to the legal profession, holding that members of an integrated bar can only be compelled to contribute to activities germane to a State's interest in regulating the legal profession and improving the quality of legal services.  <u>Keller</u>, 496 U.S. at 14.  "Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisers to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern."  <u>Id.</u> at 15-16.[14]  It is of course open to the Supreme Court of

_____

[13]The Court eventually applied the principles of <u>Abood</u> to employees in the private sector.  <u>See</u> <u>Ellis v. Railway Clerks</u>, 466 U.S. 435 (1984).

[14]Since <u>Keller</u>, a number of courts have considered whether the use of bar membership dues to finance particular types of activities is permissible.  <u>See</u>, <u>e.g.</u>, <u>Schneider IV</u>, 917 F.2d 620 (finding that an integrated bar could use dues for activities directly related to the lawyering profession, as well as for activities incidental to the operation of a bar association, such as social events and providing insurance to members); <u>Crosetto v. State Bar of Wisconsin</u>, 12 F.3d 1396 (7th Cir. 1993) (holding that

Puerto Rico to revisit the issue of whether the Colegio's Rules draw this line correctly in resolving the federal claims Castellanos chooses to raise in the state proceedings.

Castellanos makes an alternative argument that Law 43 is preempted by the Patriot Act and that as a result, jurisdiction over his claims lies exclusively in the federal courts. The Supreme Court has observed that while even a substantial claim of federal preemption may not be sufficient to render <u>Younger</u> abstention inappropriate, a "facially conclusive" claim may do the trick.  <u>New Orleans Pub. Serv., Inc.</u>, 491 U.S. at 367.  <u>See</u> <u>Chaulk Serv., Inc. v. Massachusetts Comm'n Against Discrimination</u>, 70 F.3d 1361, 1370 (1st Cir.1995) (recognizing the facially conclusive exception to abstention).  <u>See also</u> <u>Local Union No. 12004, United Steel Workers of America v. Massachusetts</u>, 377 F.3d 64, 81 (1st Cir. 2004) (remanding case to the district court for a determination of whether a claim of preemption was "facially conclusive").

When a court is presented with a matter that by long tradition has been left to state regulation, federal preemption will be found only if intervening events demonstrate that "that [is] the clear and manifest purpose of Congress."  <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947).  <u>See also</u> <u>Barnett Bank v. Nelson</u>, 517 U.S. 25, 31 (1996) (noting that such intent may be expressed explicitly in the language of a statute, or

---

the Wisconsin integrated bar may use compulsory dues only for the purposes of regulating the legal profession and improving the quality of legal services); <u>Gibson v. The Florida Bar</u>, 906 F.2d 624 (11th Cir. 1990) (holding that the Florida bar's procedures for handling members' objections to its political lobbying efforts were for the most part sufficiently protective of members' rights); <u>Popejoy v. New Mexico Bd. of Bar Examiners</u>, 831 F. Supp. 814 (D.N.M. 1993) (holding that the bar must organize its expenditures by topic and amount spent, and must allocate expenditures into chargeable and non-chargeable activities so that members have sufficient information to decide whether to object to specific uses of their dues).

implicitly through passage of a statutory scheme that extensively occupies the field, or where the purpose and objectives of federal law would be frustrated by state law). "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions. The States prescribe the qualifications for admission to practice and the standards of professional conduct. They also are responsible for the discipline of lawyers." Leis v. Flynt, 439 U.S. 438, 442 (1979). See also Bradwell v. Illinois, 83 U.S. 130, 139 (1872) ("[U]nless we are wholly and radically mistaken . . . , the right to control and regulate the granting of license to practice law in the courts of a State is one of those powers which are not transferred for its protection to the Federal government . . . .").[15]

    Castellanos' argument for preemption is somewhat difficult to follow. It appears to be based on the Patriot Act's broad definition of "terrorist activities," a definition which Castellanos contends encompasses certain activities of the Colegio that are now subject

---

[15]The regulation of the practice of law by the States has its origins in the mid-nineteenth century. "In the American colonies regulation of the bar paralleled the establishment of organized judicial systems. After efforts to get along without attorneys failed, three different systems of regulation had developed by the time of the Revolution. Four colonies followed the English system, with each court admitting attorneys to practice before it. Four other colonies adhered to the rule of comity where an attorney admitted in one court was authorized to practice before any other court. Five colonies had a centralized admission system, with control exercised by the colony's highest court or the royal governor . . . the organized bar originated during this era also, particularly in New England. After the Revolution, there was a gradual elimination, by legislative act, of formal requirements for admission to the bar. By 1860, only nine of thirty-nine states or territories had such requirements. A revival occurred after 1870, with bar associations leading the way in seeking to impose educational and other requirements on admission to the bar." Robert J. Martineau, *The Supreme Court and State Regulation of the Legal Profession*, 8 Hastings Const. L.Q. 199, 200-201 (1981), citing Roscoe Pound, *The Lawyer from Antiquity to Modern Times* (St. Paul, MN: West Publishing Co., 1953), 99-101.

to intensified federal scrutiny.[16]  This stretch, while imaginative, falls well short of the

showing of clear congressional intent that is necessary to support "facially conclusive"

preemption.[17]

Abstention under "Younger contemplates the outright dismissal of the federal suit,

and the presentation of all claims, both state and federal, to the state courts."  Gibson v.

Berryhill, 411 U.S. 564, 577 (1973).  An action claiming damages under  § 1983 must,

however, be stayed (rather than dismissed) pending termination of the underlying state

proceedings.  Kyricopoulos v. Town of Orleans, 967 F.2d 14, 16 n.1 (1st Cir. 1992), citing

Deakins v. Monaghan, 484 U.S. 193, 202 (1988).  Accordingly, the court will dismiss the

claim for declaratory judgment pursuant to the abstention doctrine and will stay the § 1983

---

[16]The Patriot Act includes in its definition of "terrorist organization" any organization (1) that has been designated as a terrorist organization by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, and upon publication in the Federal Register, and (2) that engages in "terrorist activities." 8 U.S.C. § 1182(a)(3)(B)(vi)(II). In addition, an "undesignated" terrorist organization is defined as any group of two or more individuals, whether organized or not, which engages in, or has a subgroup that engages in, terrorist activities.  See 8 U.S.C. § 1182(a)(3)(B)(vi)(III).  "Terrorist activities" consist of (1) committing or inciting to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity; (2) preparing or planning a terrorist activity; (3) gathering information on potential targets for terrorist activity; (4) soliciting funds or other things of value for, a terrorist activity or a terrorist organization; (5) soliciting any individual for membership in a terrorist organization, or for engagement in terrorist activities; and (6) committing an act that affords material support to a terrorist organization, or a member of such an organization, unless it can be demonstrated by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.  See 8 U.S.C. § 1182(a)(3)(B)(iv)(I)-(VI).

[17]If, on the other hand, Castellanos is arguing that the Patriot Act "extensively occupies the field" by creating a "whole new legal reality," he may be right insofar as the power of a State to punish acts of international or even domestic terrorism is concerned, but he is manifestly wrong in the assertion that the Patriot Act displaces the power of a State to regulate the admission of lawyers to its bar.

damages claim pending a final disposition of the disbarment proceeding presently before the Supreme Court of Puerto Rico.

## ORDER

For the foregoing reasons, the Colegio's motion to dismiss is <u>ALLOWED</u> as to Count I of Castellanos' Second Amended Complaint. The motion to dismiss the Intervenor Complaint in its entirety is also <u>ALLOWED</u>.[18] Count II of the Second Amended Complaint will be <u>STAYED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

_____

[18]Hours before the court heard argument on the motions to dismiss, counsel for the AAE filed an electronic motion seeking to withdraw, requesting that Castellanos be permitted to act as substitute counsel. The motion will be <u>ALLOWED</u> insofar as the leave to withdraw is concerned. Castellanos, however, declined to enter an appearance for the AAE. No representative of the AAE attended the hearing.

-16-